IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ONYX THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-988 (LPS) |
| | ) | |
| CIPLA LIMITED and CIPLA USA, INC., | ) | **REDACTED –** |
| | ) | **PUBLIC VERSION** |
| Defendants. | ) | |

## PLAINTIFF'S POST-TRIAL ANSWERING BRIEF

<table>
<tr><td></td><td>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>Jack B. Blumenfeld (#1014)<br>Karen Jacobs (#2881)<br>Megan E. Dellinger (#5739)<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>(302) 658-9200<br>jblumenfeld@mnat.com<br>kjacobs@mnat.com<br>mdellinger@mnat.com</td></tr>
</table>

OF COUNSEL:

Lisa B. Pensabene
Hassen Sayeed
Will Autz
Margaret O'Boyle
Caitlin P. Hogan
Carolyn Wall
Eberle Schultz
James Yi Li
Samantha M. Indelicato
Mark A. Hayden
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000

Meng Xu
O'MELVENY & MYERS LLP
Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

Original Filing Date: June 14, 2019
Redacted Filing Date: June 21, 2019

*Attorneys for Plaintiff*

John R. Labbé
Kevin M. Flowers
Thomas R. Burns
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606
(312) 474-6300

Wendy A. Whiteford
Brian Kao
C. Nichole Gifford
Joseph E. Lasher
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
(805) 447-1000

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iv

I.      Introduction and Summary of Argument ........................................................ 1

II.     Cipla Did Not Meet Its High Burden of Proving the Asserted Claims Are Invalid ......... 3

III.    A POSA Was Someone Working in the Field of Drug Discovery and
        Development to Find an Improved Therapeutic Proteasome Inhibitor ............................ 5

IV.     Cipla Did Not Prove That the Compound Patent Claims Are Obvious ............................ 5

        A.      Cipla Did Not Prove That a POSA Would Have Chosen YU-101 as a Lead
                Compound ................................................................................ 6

                1.      Other Potential Lead Compounds Were Superior to YU-101 ................... 6

                2.      YU-101 Did Not Meet Prior Art Criteria for a Lead Compound ............. 7

                3.      Cipla's Lead Compound Analysis Is Factually and Legally Flawed......... 9

        B.      Cipla Did Not Prove That a POSA Would Have Modified YU-101 to
                Arrive at Carfilzomib ................................................................ 11

                1.      A POSA Would Not Have Been Motivated to Address YU-101's
                        Unknown Solubility Problem ................................................ 12

                2.      There Were Many Possible Ways to Address YU-101's
                        (Unknown) Solubility Problem .............................................. 12

                        a.      A POSA Would Not Have Modified the N-Terminus of
                                YU-101 ............................................................ 13

                        b.      A POSA Would Not Have Chosen a Weakly Basic Amine
                                Substituent........................................................ 13

                        c.      A POSA Would Not Have Added a Basic (Chargeable)
                                Morpholino to the N-Terminus of YU-101 ........................... 14

                3.      Designing a Better Molecular Probe Would Not Have Led to
                        Carfilzomib .............................................................. 15

                4.      Cipla Did Not Prove That a POSA Would Have Had a Reasonable
                        Expectation of Success ................................................... 16

        C.      Cipla's Resurrected §112 Defense Should Be Rejected ...................... 16

TABLE OF CONTENTS
(continued)

Page

V.   Cipla Did Not Prove That the Compound Patent Claims Are Invalid Under 35
     U.S.C. §102(f) ............................................................................................. 17

     A.   The Research Plan Does Not Show Conception of Carfilzomib ........................ 18

     B.   "R=Morpholino" Does Not Disclose Carfilzomib ............................................. 18

     C.   Drs. Crews and Bunin Are Not Inventors of Carfilzomib .................................. 21

     D.   Cipla Did Not Prove Communication of a Prior Conception of Carfilzomib
          to the Named Inventors ...................................................................................... 22

VI.  Cipla Did Not Prove That the Compound Patent Claims Are Obvious Over the
     Research Plan ................................................................................................. 23

     A.   35 U.S.C. §103(c)(1) Precludes the Use of the Research Plan as Prior Art
          for an Obviousness Challenge ............................................................................ 23

     B.   Dr. Bunin Was Obligated to Assign His Contributions to Proteolix .................. 24

     C.   Dr. Crews Was Obligated to Assign His Contributions to Proteolix .................. 25

     D.   The Research Plan Would Not Render Carfilzomib Obvious ............................. 26

VII. Cipla Did Not Prove That the Compound Patent Claims Are Invalid for
     Obviousness-Type Double Patenting Over Claim 15 of the '099 Patent ...................... 27

VIII. Cipla Did Not Prove That the Asserted Claims of the '112 Patent Are Obvious ........... 29

     A.   A POSA Did Not Know the Structure or Properties of Carfilzomib .................. 30

     B.   A POSA Developing a Pharmaceutical Formulation for Carfilzomib
          Would Have Balanced Solubility and Stability .................................................. 30

     C.   Claim 31 of the '112 Patent Was Not Obvious .................................................. 32

          1.   A POSA Would Not Have Been Motivated to Use SBECD .................. 32

          2.   A POSA Would Not Have Been Motivated to Use pH 3.5 ................... 33

          3.   A POSA Would Have Lacked a Reasonable Expectation of
               Success with the Composition of Claim 31 ............................................ 35

     D.   Claim 32 of the '112 Patent Was Not Obvious .................................................. 36

     E.   Neither Claim 31 or 32 of the '112 Patent Is Invalid for Obviousness-Type
          Double Patenting Over Claim 25 of the '125 Patent .......................................... 37

TABLE OF CONTENTS
(continued)

Page

IX.    Cipla Did Not Rebut the Objective Indicia of Non-Obviousness.................................... 38

       A.    Kyprolis® Fulfilled a Long-Felt But Unmet Need............................................... 39

       B.    There Was Industry Skepticism That an Irreversible Epoxyketone
             Inhibitor Like Kyprolis® Would Work as a Therapeutic .................................... 39

X.     Conclusion .................................................................................................................. 40

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*,
   35 F. Supp. 3d 163 (D. Mass. 2014) .................................................................... 22

*Advanced Cardiovascular Sys. v. Medtronic, Inc.*,
   No. 95-3577, 1996 WL 467293 (N.D. Cal. July 24, 1996) .................................... 28

*Agrofresh Inc. v. Mirtech, Inc.*,
   257 F. Supp. 3d 643 (D. Del. 2017) ...................................................................... 25

*Alfred E. Mann Found. for Sci. Res. v. Cochlear Corp.*,
   604 F.3d 1354 (Fed. Cir. 2010) ............................................................................. 28

*Allergan, Inc. v. Sandoz Inc.*,
   726 F.3d 1286 (Fed. Cir. 2013) ............................................................................. 11

*Allergan, Inc. v. Sandoz, Inc.*,
   796 F.3d 1293 (2015) ............................................................................................. 17

*Aventis Pharma S.A. v. Hospira, Inc.*,
   743 F. Supp. 2d 305 (D. Del. 2010) ...................................................................... 11

*Azure Networks, LLC v. CSR PLC*,
   771 F.3d 1336 (Fed. Cir. 2014), *vacated*, 135 S. Ct. 1846 (Apr. 20, 2015) ........... 28

*Bayer Intellectual Prop. GmbH v. Aurobindo Pharma Ltd.*,
   No. 15-902, 2018 WL 3410020 (D. Del. July 13, 2018) ........................................ 39

*Bayer Pharma AG v. Watson Labs., Inc.*,
   212 F. Supp. 3d 489 (D. Del. 2016) ...................................................................... 38

*Bosies v. Benedict*,
   27 F.3d 539 (Fed. Cir. 1994) ................................................................................. 21

*Burroughs Wellcome Co. v. Barr Labs., Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) ............................................................................... 18

*Cadence Pharm., Inc. v. Exela Pharma Scis., LLC*,
   No. 11-733-LPS, 2013 WL 11083853 (D. Del. Nov. 14, 2013), *aff'd*, 780 F.3d 1364
   (Fed. Cir. 2015)....................................................................................................... 39

*Cumberland Pharm. v. Mylan Institutional LLC*,
   846 F.3d 1213 (Fed. Cir. 2017) ......................................................................... 18, 22

iv

TABLE OF AUTHORITIES
(continued)

Page(s)

*Daiichi Sankyo Co. v. Matrix Labs., Ltd.,*
    619 F.3d 1346 (Fed. Cir. 2010), *cert. denied*, 562 U.S. 1286 (Mar. 21, 2011) (No. 10-
    770) ................................................................................................................ 4, 6, 15, 16

*DDB Tech. v. MLB Advanced Media,*
    517 F.3d 1284 (Fed. Cir. 2008) .................................................................................... 25

*DuFrene v. Kaiser Steel Corp.,*
    231 Cal. App. 2d 452 (D. Ct. App. 1964) ..................................................................... 25

*Eisai Co. v. Dr. Reddy's Labs., Ltd.,*
    533 F.3d 1353 (Fed. Cir. 2008) ................................................................................. 4, 11

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.,*
    689 F.3d 1368 (Fed. Cir. 2012) .................................................................................... 37

*Eli Lilly & Co. v. Teva Pharm. USA, Inc.,*
    619 F.3d 1329 (Fed. Cir. 2010) .................................................................................... 12

*Ferring B.V. v. Watson Labs., Inc.*
    764 F.3d 1401 (Fed. Cir. 2014) .................................................................................... 39

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.,*
    655 F.3d 1291 (Fed. Cir. 2011) .................................................................................... 17

*Genzyme Corp. v. Dr. Reddy's Labs., Ltd.,*
    C.A. No. 13-1508 (GMS), 2016 WL 2757689 (D. Del. May 11, 2016) ......................... 6

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) ..................................................................................................... 5, 38

*Huang v. Cal. Inst. of Tech.,*
    No. 03-1140, 2004 WL 2296330 (C.D. Cal. Feb. 18, 2004) ......................................... 21

*In re Brana,*
    51 F.3d 1560 (Fed. Cir. 1995) ...................................................................................... 17

*In re Omeprazole Patent Litig.,*
    490 F. Supp. 2d 381 (S.D.N.Y. 2007), *aff'd*, 536 F.3d 1361 (Fed. Cir. 2008) ............... 14

*In re Papesch,*
    315 F.2d 381 (CCPA 1963) .......................................................................................... 11

*In re Sullivan,*
    498 F.3d 1345 (Fed. Cir. 2007) .................................................................................... 10

TABLE OF AUTHORITIES
(continued)

Page(s)

*Indus. Tech. Research Inst. v. Pac. Biosciences of Cal., Inc.*,
 640 F. App'x 871 (Fed. Cir. 2016) ........................................................ 24

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*,
 738 F.3d 1337 (Fed. Cir. 2013) ........................................................ 4, 5

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
 821 F.3d 1359 (Fed. Cir. 2016) ........................................................ 11

*Invitrogen Corp. v. Clontech Labs., Inc.*,
 429 F.3d 1052 (Fed. Cir. 2005) ........................................................ 22

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007)........................................................ passim

*Lindemann Maschinefabrik GMBH v. Am. Hoist & Derrick Co.*,
 730 F.2d 1452 (Fed. Cir. 1984) ........................................................ 23

*Mahurkar v. C.R. Bard, Inc.*,
 79 F.3d 1572 (Fed. Cir. 1996) ........................................................ 3, 23

*McGovern v. Gen. Holding, Inc.*,
 No. 1296-N, 2006 WL 4782341 (Del. Ch. June 2, 2006)........................................................ 26

*Merck v. Biocraft*,
 874 F.2d 804 (Fed. Cir. 1989) ........................................................ 14

*Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
 976 F.2d 1559 (Fed. Cir. 1992) ........................................................ 6, 30

*Mylan Pharm. Inc. v. Research Corp. Techs., Inc.*,
 914 F.3d 1366 (Fed. Cir. 2019) ........................................................ 6, 14, 15

*Novartis Pharm. Corp. v. Noven Pharm., Inc.*,
 125 F. Supp. 3d 474 (D. Del. 2015)........................................................ 27, 28

*Novartis Pharm. Corp. v. Par Pharm., Inc.*,
 48 F. Supp. 3d 733 (D. Del. 2014), *aff'd*, 611 F. App'x 988 (Fed. Cir. 2015)........................................................ 12

*Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*,
 923 F.3d 1051 (Fed. Cir. 2019) ........................................................ 36

*Okajima v. Bourdeau*,
 261 F.3d 1350 (Fed. Cir. 2001) ........................................................ 5

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
 520 F.3d 1358 (Fed. Cir. 2008) ........................................................ 10, 14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012) ............................................................ 6, 10, 11, 29

*Pannu v. Iolab Corp.*,
   155 F.3d 1344 (Fed. Cir. 1998) ........................................................................... 22

*Pfizer Inc. v. Mylan Pharm. Inc.*,
   71 F. Supp. 3d 458 (D. Del. 2014), *aff'd*, 628 F. App'x 764 (Fed. Cir. 2016)................. 12, 39

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007) ........................................................................... 36

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ........................................................................ 15, 22

*Purdue Pharma L.P. v. Depomed, Inc.*,
   643 F. App'x 960 (Fed. Cir. 2016) ....................................................................... 12

*Ruiz v. A.B. Chance Co.*,
   234 F.3d 654 (Fed. Cir. 2000) ............................................................................ 38

*Singh v. Brake*,
   317 F.3d 1334 (Fed. Cir. 2003) ...................................................................... 18, 21

*Sweetman v. Strescon Indus.*,
   389 A.2d 1319 (Del. Super. Ct. 1978) .................................................................. 25

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007) ...................................................................... 4, 6, 8

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*,
   417 F. Supp. 2d 341 (S.D.N.Y. 2006) ................................................................... 11

*Tech. Licensing Corp. v. Videotek, Inc.*,
   545 F.3d 1316 (Fed. Cir. 2008) ............................................................................ 3

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharms. LP*,
   748 F.Supp.2d 453 (E.D. Pa. 2010), *aff'd*, 661 F.3d 1378 (Fed. Cir. 2011) ........................... 22

*UCB v. Accord Healthcare*,
   201 F. Supp. 3d 491 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018) ..................... 37, 38

*UCB, Inc. v. Accord Healthcare, Inc.*,
   890 F.3d 1313 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 574 (Nov. 19, 2018) (No. 18-
   441) ....................................................................................................... 4

<u>TABLE OF AUTHORITIES</u>
(continued)

Page(s)

*Unigene Labs., Inc. v. Apotex, Inc.*,
  655 F.3d 1352 (Fed. Cir. 2011) .................................................................. 3, 30, 37

*WBIP, LLC v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016) ...................................................................... 39, 40

**Statutes**

21 U.S.C. §356(b) ................................................................................................ 40

35 U.S.C. §103 ...................................................................................................... 3

35 U.S.C. §103(c)(1) ........................................................................................... 24

35 U.S.C. §103(c)(2)-(3) ..................................................................................... 24

35 U.S.C. §256 .................................................................................................... 23

**Other Authorities**

H.R. Rep. No. 108-425 (2004) ............................................................................ 24

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '042 Patent | U.S. Patent No. 7,417,042 (JTX-2) |
| '099 Patent | U.S. Patent No. 6,831,099 (DTX-39/PTX-731) |
| '112 Patent | U.S. Patent No. 7,737,112 (JTX-4) |
| '125 Patent | U.S. Patent No. 8,207,125 (JTX-6) |
| '818 Patent | U.S. Patent No. 7,232,818 (JTX-1) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | Claims 23 and 24 of the '042 Patent, claims 31 and 32 of the '112 Patent, and claim 1 of the '125 Patent |
| CB | Cipla's Opening Brief (D.I. 521) |
| Cipla | Defendants Cipla Limited and Cipla USA Inc. |
| DF | Defendant Cipla's Proposed Finding of Facts (D.I. 522) |
| Compound Patents | The '042 and '125 Patents |
| FDA | United States Food and Drug Administration |
| Kyprolis® | Carfilzomib for injection product |
| NDA | New Drug Application |
| Patents-in-Suit | The '042, '125, and '112 Patents |
| POSA | Person of ordinary skill in the art in 2004 |
| Onyx | Plaintiff Onyx Therapeutics, Inc. |
| PF | Plaintiff Onyx's Proposed Findings of Facts |
| SF | Stipulated Facts (D.I. 476, Ex. 1) |

All emphasis herein added unless otherwise noted

## I.    Introduction and Summary of Argument

Proteolix scientists took counterintuitive paths to make the active ingredient carfilzomib (a proteasome inhibitor) and the formulation to deliver it to patients. Those inventions resulted in the cancer medicine Kyprolis® that has extended the lives of thousands of patients. It is only with hindsight that Cipla identifies pieces of these inventions in what went before and, even then, the success in their combination remains unexplainable.

Conventional thinking about proteasome inhibitors at the time rejected compounds with any of three undesired characteristics: irreversible binding, metabolic instability, and a lack of data about proteasome specificity. Proteolix scientists pursued compounds with all three problems, and then went even further: they added chemical groups that the art taught would decrease potency significantly. Surprisingly, these choices solved a toxicity problem that had previously seemed insurmountable. Their invention, carfilzomib, showed greater activity with less toxicity than the benchmark compound, bortezomib, the only proteasome inhibitor approved as a drug. Carfilzomib also had dramatically improved aqueous solubility—1000-fold greater than related compounds. These inventions are reflected in the asserted claims of the '042 and '125 Patents (the "Compound Patents").

Even after the invention of carfilzomib, formulation for pharmaceutical use remained an issue. Carfilzomib's structure, an epoxyketone warhead and peptide backbone, had chemical groups known to be unstable. To work, the warhead and guidance system had to stay intact until the compound reached the proteasome target in the body. Proteolix scientists took a counterintuitive path once again. They used ingredients that the art taught would destroy the compound, but which instead, surprisingly, solubilized and stabilized it, allowing delivery to patients. That invention is reflected in the asserted claims of the '112 Patent.

Cipla has admitted infringement of all Asserted Claims and seeks to sell an exact copy of

1

Kyprolis® before the Patents-in-Suit expire. Cipla initially asserted a kitchen sink of defenses, but dropped most on the eve of—and during—trial, including enablement and all equitable defenses. Cipla bears the burden of proof by clear and convincing evidence on the defenses that remain. But Cipla cannot meet its burden (in fact, of Cipla's 250 proposed findings of fact, 41 have no supporting citation to the record at all). Cipla's burden cannot be met by possibilities, assumptions, or argument. To summarize:

1. Cipla's obviousness argument on the compound claims lacks proof of a motivation to first select YU-101 as a lead, to modify it to arrive at carfilzomib, or any expectation of success in doing so. Cipla ignores entirely that the prior art taught away from the needed choices. Cipla's untimely argument about a search for a better molecular probe is flawed for the same reasons.

2. Cipla's enablement argument improperly resurrects a defense that Cipla removed from the case before trial. Regardless, the utility of the claimed compounds is disclosed and the claims are enabled because of pharmacological data in the patent specifications' description.

3. Cipla argues that the invention of carfilzomib was purportedly embodied in the internal and confidential Research Plan, or alternatively that carfilzomib is obvious over it. But, Cipla's own expert admitted otherwise, conceding that the critical disclosure in the Research Plan *is not* carfilzomib, and that the rest of the Research Plan shows "more than thousands" of possibilities for research. It suggests searching for lead compounds lacking the three undesirable characteristics, and adding substituents consistent with what the prior art taught instead of the opposite approach taken by the inventors. The approaches it proposed could not possibly have led to the claimed inventions. The Research Plan also cannot be used for obviousness because §103(c)(1) excludes the contributors' work from the prior art.

4. Cipla's obviousness-type double patenting arguments concerning the Compound Patents

fail for lack of common ownership or common inventors between the challenged patents and the reference patent (Yale's '099 Patent). Yale's grant to Proteolix of a license to the '099 Patent is a license, not an assignment of ownership. In any event, the Patent Office already considered the '099 Patent and found the claims non-obvious over it (and YU-101).

5. Cipla's obviousness challenge to the '112 formulation patent claims also fails for lack of proof. Cipla ignores the fact that, given carfilzomib's unique stability issues, the claimed combination of carfilzomib with SBECD and citric acid at a pH of 3.5 would have been expected to degrade the carfilzomib so that it would no longer function as a medicine. For similar reasons, Cipla also cannot prevail on its claims of obviousness-type double patenting over the '125 Patent.

## II.  Cipla Did Not Meet Its High Burden of Proving the Asserted Claims Are Invalid

To overcome the presumption of validity, Cipla must prove by clear and convincing evidence that the "differences between the claimed invention and the prior art are such that the claimed invention as whole would have been obvious." 35 U.S.C. §103. That burden—including establishing a reference as prior art—remains on Cipla and never shifts to Onyx. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008).

Because nearly all inventions are "combinations of what, in some sense, is already known," a claim cannot be held obvious "merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007). Instead, the patent challenger must prove a motivation to "select[] and combine[] those prior art elements in the normal course of research and development to yield the claimed invention." *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing *KSR*, 550 U.S. at 421). Additionally, the challenger must prove "a reasonable expectation of success" that the claimed combination would achieve the goal that had motivated it. *Institut Pasteur & Universite Pierre et*

*Marie Curie v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013).

This test applies equally to chemical compounds. Cipla must show that: (1) "a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts;" (2) "the prior art would have supplied one of ordinary skill in the art with a reason or motivation to modify a lead compound to make the claimed compound;" and (3) there would have been "a reasonable expectation of success" in doing so. *Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010); *see also Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356-57 (Fed. Cir. 2008).

Unable to meet this burden, Cipla argues that the lead/modification/expectation analysis should not apply. Previous incarnations of that argument have been rejected by the Federal Circuit, which has held that the compound obviousness analysis reflects the requirement under *KSR* to identify a motivation to select and combine prior art. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007) (After *KSR,* "it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound."); *see also UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 574 (Nov. 19, 2018) (No. 18-441); *Daiichi Sankyo*, 619 F.3d at 1352, *cert. denied*, 562 U.S. 1286 (Mar. 21, 2011) (No. 10-770).

The Supreme Court's analysis in *KSR* also demonstrates why Cipla's repeated incantations of "obvious to try" or "routine experimentation" are unavailing. The Supreme Court says obviousness may be found: "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions," and thus "a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp." *KSR*, 550 U.S. at 402-03; *see also Daiichi Sankyo*, 619 F.3d at 1354. The proof here, however, shows that the options were

not finite, and the outcomes were not predictable.

## III.   A POSA Was Someone Working in the Field of Drug Discovery and Development to Find an Improved Therapeutic Proteasome Inhibitor

Obviousness is viewed from the perspective of a person of ordinary skill in the art at the time of the invention (a "POSA"). *Graham v. John Deere Co.*, 383 U.S. 1, 3 (1966). Experts for both sides generally agreed on the qualifications of a POSA: a degree in chemistry, pharmacology, or a related field, practical experience, and collaboration in a multidisciplinary drug development team, including formulators. PF ¶¶ 18-19. The Court need not resolve the slight differences relating to education and experience because the experts agreed it would not change their opinions. PF ¶ 20; *see Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (specific findings on skill in the art not needed when it does not "influence[] the ultimate determination").

The parties' experts also agreed on the problem to be solved—that a POSA would have been motivated to develop an improved therapeutic proteasome inhibitor, with better efficacy and lower toxicity than the only FDA-approved proteasome inhibitor in the prior art, bortezomib. PF ¶¶ 21-23; CB 9 (admitting the need for a better therapeutic agent after the approval of bortezomib). Cipla's definition of a POSA was limited to drug development. PF ¶ 19 (POSA collaborates with individuals in "design and synthesis of peptides as drug molecules, formulation of drug products, or other professionals in the drug development field"). Cipla's about-face in its summation and brief—alleging a second motivation of making a better "molecular probe"—should be rejected. CB 4-6; *Institut Pasteur*, 738 F.3d at 1346 ("without a sound explanation for doing otherwise," a POSA would not "switch to a different goal that" was a "less worthwhile pursuit").

## IV.   Cipla Did Not Prove That the Compound Patent Claims Are Obvious

Cipla's argument—that a POSA would have started with YU-101 as a lead and been motivated to modify it to create carfilzomib—was ***already*** considered and rejected by the Patent

Office. PF ¶ 105. Cipla's burden of proof is thus more difficult to meet, and was not met at trial. *Genzyme Corp. v. Dr. Reddy's Labs., Ltd.*, C.A. Nos. 13-1506, 13-1508 (GMS), 2016 WL 2757689, at *11 (D. Del. May 11, 2016) ("There is a presumption that decisions made by the PTO Examiner are valid."). "Where the PTO considered a piece of prior art, and issued a patent notwithstanding that prior art, a court owes some deference to the PTO's decision." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1572 (Fed. Cir. 1992).

### A. Cipla Did Not Prove That a POSA Would Have Chosen YU-101 as a Lead Compound

#### 1. Other Potential Lead Compounds Were Superior to YU-101

A lead compound is a compound in the prior art that would be "most promising to modify in order to improve upon its [] activity and obtain a compound with better activity." *Takeda*, 492 F.3d at 1357. Selection of a lead compound "is guided by evidence of the compound's pertinent properties," including "positive attributes such as activity and potency," "adverse effects such as toxicity," and any other relevant properties known in the prior art. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1292 (Fed. Cir. 2012); *see also Mylan Pharm. Inc. v. Research Corp. Techs., Inc.*, 914 F.3d 1366, 1375 (Fed. Cir. 2019) (POSA "would consider *all* of a compound's properties together," including stability, potency, and toxicity) (emphasis in original).

The more that is known about a compound's properties and the better those properties (*i.e.*, the "data package"), the more promising it is as a lead. PF ¶¶ 29, 34-35; *Daiichi Sankyo*, 619 F.3d at 1354. When evaluating prior art proteasome inhibitors as potential lead compounds, a POSA would have considered efficacy, safety, and deliverability. PF ¶ 24. As to *efficacy*, a POSA would have selected a lead compound with a mechanism of action that had been proven to be efficacious in humans, and which exhibited potent inhibition of the proteasome not only in the test tube but also in cells and animals, preferably humans. PF ¶ 25. Regarding *safety*, a POSA would have been

concerned about the use of irreversible (permanent) inhibitors of the proteasome—a ubiquitous target in cells that is necessary for life. PF ¶ 26. Finally, as to ***deliverability***, a POSA would have desired a highly bioavailable and metabolically stable compound. PF ¶ 28.

Several classes of proteasome inhibitors at the time of invention were comprised of many compounds with very different properties. PF ¶ 29. The only FDA-approved proteasome inhibitor at the time of invention was bortezomib.[1] PF ¶ 30. Bortezomib had a robust data package, with significant advantages over other known proteasome inhibitors, including reversible binding, solubility, ease of manufacture, and small size. *Id.* PS-519 was a reversible and potent β-lactone proteasome inhibitor that had advanced to human clinical trials. PF ¶ 31. Marizomib was also a β-lactone proteasome inhibitor that was potent and specific. PF ¶ 32. TMC-95A, a natural product, was yet another promising lead compound known to be a potent and reversibly binding inhibitor. PF ¶ 33. All four compounds—bortezomib, PS-519, marizomib, and TMC-95A—had data packages far better than that of YU-101. Each was a far better lead. PF ¶ 29, 34, 48.

### 2. YU-101 Did Not Meet Prior Art Criteria for a Lead Compound

The prior art taught three reasons for "reject[ing] a proteasome inhibitor for future clinical development": (i) metabolic instability; (ii) lack of proteasome specificity; and (iii) irreversible binding to the proteasome. PF ¶ 36. YU-101 had all three problems. PF ¶¶ 37-41.

**Metabolic Instability:** Peptide epoxyketones like YU-101 were considered to be metabolically unstable, both because of the epoxide on the "warhead," known to be highly reactive and unstable in solution, and the peptide backbone, known to be susceptible to degradation. PF ¶ 37. Multiple prior art references, real-world experience, and Cipla's own formulator's testimony

---

[1] Cipla argues that a POSA would not have chosen bortezomib because it caused peripheral neuropathy. CB 19. The cause of that neuropathy was unknown. If on-target toxicity were suspected, a POSA would not choose an irreversible inhibitor. PF ¶ 27. If off-target toxicity were suspected, a POSA would not choose an inhibitor with high reactivity and no proteasome specificity data. *Id.* Either suspicion would counsel against selecting YU-101 as a lead.

establish that there were concerns the warhead was unstable. *Id.* The prior art also taught peptides like YU-101 were unstable. *Id.* Bortezomib—which has only two amino acids and thus lacks "peptidic character"—reflects an attempt to work around those concerns. PF ¶ 30. With four amino acids, YU-101 would have gone in the opposite direction and been disfavored as a lead. PF ¶ 162. Nothing in the art established YU-101's metabolic stability. Cipla's argument to the contrary focuses on a mouse study that lacks stability data and questions its own results. PF ¶ 45; CB 17.

**Lack of proteasome specificity:** Dr. Bachovchin admitted that no data in the prior art established that YU-101 had specificity for the proteasome over other enzymes. PF ¶ 40-41. The art showed that other epoxyketones bound to different enzymes (PF ¶ 40), and that their epoxide warheads reacted to cause side effects like necrosis, mutagenesis, carcinogenesis, and teratogenesis. PF ¶ 37; PTX-355A at 11. Other potential lead compounds considered by Dr. Lipinski had data showing their specificity for the proteasome. PF ¶¶ 30-33.

**Irreversible binding to the proteasome:** YU-101 was known to be an ***irreversible*** inhibitor of the proteasome. PF ¶ 38. The literature reflected that irreversible inhibitors were disfavored because they permanently modified substrates, with associated problems of on-target toxicity, off-target toxicity, and potentially lethal immune responses. *Id.* Dr. Bachovchin conceded this bias, and references that Cipla relied upon similarly acknowledge the "uphill battle to get irreversible inhibitors considered as potential clinical candidates." *Id.* The single statement in the '099 Patent relied upon by Cipla (CB 15) suggesting that the disclosed compounds could be used for treatment would not have persuaded a POSA otherwise, particularly given that the '099 Patent lacks toxicity data. DTX-39; *see Takeda*, 492 F.3d at 1358 (disclosures in a patent and prosecution history were negated by "more exhaustive and reliable scientific analysis . . . showing that there were many

promising, broad avenues for further research").[2]

Cipla cites YU-101's alleged specificity for the proteasome as allaying concerns about it binding irreversibly. CB 14-15. But, this alleged "specificity" is only an assumption based on the binding mechanism of *other* epoxyketones. CB 14-15 (citing DTX-55; DTX-81). Dr. Bachovchin admitted that his assumption relied on an incomplete illustration of epoxomicin binding to the proteasome (PF ¶ 41), that YU-101 bound differently than epoxomicin (*id.*), and that epoxyketones were known to bind to other targets (PF ¶ 40). Cipla also ignores that an irreversible inhibitor can cause on-target toxicity by binding to the proteasome in non-cancerous tissues. PF ¶ 26.

### 3. Cipla's Lead Compound Analysis Is Factually and Legally Flawed

Dr. Bachovchin identified YU-101 as a lead only by ignoring prior art criteria relating to metabolic stability, proteasome specificity, and reversibility.[3] PF ¶¶ 36, 43-44. Even under Dr. Bachovchin's criteria of "potency" and "selectivity," YU-101 comes up short. Cipla claims YU-101 had demonstrated potency but the prior art taught that YU-101's test tube data did not translate well into cells. PF ¶ 45. For animal potency, the prior art contained only a single experiment with inconclusive results involving administration of YU-101 to 10 mice. *Id.* A POSA would not have found this promising. *Id.* Nor would a POSA have chosen YU-101 based on its CT-L selectivity. PF ¶ 46. As Dr. Bachovchin conceded, CT-L selectivity and proteasome specificity are different, and only proteasome specificity reduces off-target toxicity. *Id.* There was *no data* to show that

---

[2] Cipla contends, with no literature support, that dose adjustment can keep an irreversible inhibitor in the blood and limit toxicity. DF ¶ 137; CB 15. Dr. Bachovchin argues without support that blood-borne multiple myeloma cells would act as a "sponge" to prevent the irreversible inhibitor from diffusing into other tissues. PF ¶ 39. Those theories are incorrect. Dr. Siegel, the only oncologist to testify, explained that multiple myeloma actually resides in the bone marrow. *Id.*

[3] Dr. Bachovchin skewed the analysis from the other promising leads by comparing chemical classes generally, not specific promising compounds, *except* for the epoxyketones, from which he plucked out YU-101. PF ¶ 42. Potential lead compounds in the same chemical classes possessed very different properties. *Id.*

selectively inhibiting a single proteasome subunit (*e.g.*, CT-L) would reduce toxicity. *Id.* Prior art data showed that inhibiting multiple subunits was needed for efficacy. *Id.*

Cipla cites no legal support for its newly-raised argument that a patentee must prove "specific chemical modifications that could be made to [other leads]" to show the leads were more promising. CB 19. Rather, it is *Cipla's* burden to show that a POSA would have selected YU-101 "from the panoply of known compounds in the prior art" for further development efforts. *Otsuka*, 678 F.3d at 1292. Cipla presented no evidence that PS-519, marizomib, or TMC-95A would have been difficult to modify or further develop, such as with new formulations. And Cipla's complaint that these lead compounds required "open ended research, with no guidance at all from the prior art" (CB 19) is true of YU-101. *See* PF ¶ 36.

Cipla's reliance on Proteolix's selection of YU-101 as a lead compound (CB 10) also violates the well-established principle that the path of the inventors cannot substitute for the knowledge of a POSA. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). That Proteolix's founders and inventors believed in their own approach does not make the invention obvious. PF ¶ 47; *Otsuka*, 678 F.3d at 1296 (admonishing Defendants' use of the **"'inventors' and Otsuka's** own development efforts" to try to prove obviousness). In fact, with respect to YU-101, Proteolix's internal documents made clear that YU-101 was "not yet understood in sufficient detail to nominate the molecule for development" and Proteolix considered other compounds as possible "leads." DTX-991 at 2; PF ¶¶ 4, 101.

Finally, Cipla argues that criticisms of YU-101 are "legally irrelevant" because the asserted claims are to a chemical compound, without limitations on safety, efficacy, or deliverability. CB 17. That is wrong—a chemical compound's structure and properties are inseparable aspects of the invention. *See In re Sullivan*, 498 F.3d 1345, 1353 (Fed. Cir. 2007); *In re Papesch*, 315 F.2d 381,

391 (CCPA 1963).[4] Selection of a lead compound "is guided by evidence of the compound's pertinent properties," including unclaimed "positive attributes such as activity and potency" and "adverse effects such as toxicity." *Otsuka*, 678 F.3d at 1292. Cipla's suggestion that the selection of a lead would ignore the compounds' known negative properties contradicts the law and the evidence of the drug development process in this case. *Eisai*, 533 F.3d at 1359. Skepticism about YU-101 as a lead was borne out by real-world evidence. PF ¶ 162. Instead, bortezomib was the benchmark for the industry, and the only other proteasome inhibitor on the market today is a boronate. PF ¶ 30.

## B.   Cipla Did Not Prove That a POSA Would Have Modified YU-101 to Arrive at Carfilzomib

To prevail, Cipla must also prove that a POSA would have been motivated to modify YU-101 to arrive at the structure of carfilzomib, with a reasonable expectation of success. *Otsuka*, 678 F.3d at 1292-93. The motivation to modify that lead compound depends on the hoped-for properties of such modification, even if those properties are not recited in the claims. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (explaining that the unclaimed, but desired properties of a process are "central to a finding of no motivation to combine"); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 417 F. Supp. 2d 341, 372 (S.D.N.Y. 2006) (defendants did not show that "synthesizing [the invention compound] pioglitazone would result in the discovery of a non-toxic, effective treatment for diabetes [problem to be solved, not claimed], and therefore [a POSA] would not have had any motivation to do so"). Here, a POSA would have been motivated to address the known disadvantages of YU-101: irreversible binding and metabolic instability (both of the warhead and entire peptide backbone). PF ¶¶ 49. A POSA could have made many potential modifications to address these problems. *Id.*

---

[4] Cipla's cited cases do not involve compounds but instead claim compositions, methods of use, and formulations—and no lead analysis. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013); *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 342 (D. Del. 2010).

### 1.     A POSA Would Not Have Been Motivated to Address YU-101's Unknown Solubility Problem

Cipla argues that the motivation to modify YU-101 came from its "only one actual shortcoming and that was its poor water solubility." CB 19. Unlike YU-101's other shortcomings (which Cipla ignores), insufficient solubility was not documented in the art; to the contrary, the Adams 2003 reference, which Cipla cites extensively, states that YU-101 has "favourable solubility characteristics." PF ¶ 50; PTX-391. And, as Cipla's own corporate representative and formulator admitted, a compound's solubility cannot be predicted from its structure alone. PF ¶ 51. Post-invention testimony by former Proteolix employees, privy to non-public data, is neither prior art nor indicative of the state of the art to a POSA. *Id.*; *see Eli Lilly & Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1340 (Fed. Cir. 2010) ("[T]he record will not allow this court to conflate Lilly scientists with those of ordinary skill in the art.").

Cipla argues that YU-101's solubility problem could be determined (CB 11), but the relevant inquiry is not whether the problem was ***knowable***, but whether the problem was actually ***known***. *Pfizer Inc. v. Mylan Pharm. Inc.*, 71 F. Supp. 3d 458, 473 (D. Del. 2014), *aff'd*, 628 F. App'x 764 (Fed. Cir. 2016) (rejecting that a POSA would be concerned with solubility without data establishing the problem); *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 966 (Fed. Cir. 2016) (patent challenger did not show "problem was known in the art"). From their extensive confidential research, Proteolix scientists discovered that YU-101's low solubility precluded its successful administration to humans. PF ¶ 52. "There can be no motivation to combine prior art references to solve a problem no one knows exists." *Novartis Pharm. Corp. v. Par Pharm., Inc.*, 48 F. Supp. 3d 733, 758 (D. Del. 2014), *aff'd*, 611 F. App'x 988 (Fed. Cir. 2015).

### 2.     There Were Many Possible Ways to Address YU-101's (Unknown) Solubility Problem

Cipla concedes that the various ways a POSA could have sought to address the solubility

problem of YU-101, had it been known, included chemical modifications at nearly all locations on the molecule. CB 11; PF ¶ 53. Cipla lumps together these thousands of potential modifications ("modify[ing] a molecule with a solubilizing substituent group") into what it calls "one such known solution." CB 12. The *specific* modifications required to get from YU-101 to carfilzomib were at best a needle in a haystack that could not have been predicted to sufficiently solubilize YU-101 while retaining potency. PF ¶¶ 54, 57, 59-60, 71, 73.

### a.      A POSA Would Not Have Modified the N-Terminus of YU-101

Cipla argues the thousands of potential modifications could be narrowed to only modifications on the N-terminus because no other location "made any sense." CB 13. But as Dr. Bachovchin conceded on cross-examination, the prior art taught that N-terminus substitutions have profound and unpredictable impacts on potency, subunit selectivity, and proteasome access. PF ¶¶ 53-56; Bogyo (PTX-60). Even the "experiments with biotinylation" on which Cipla relies showed that "very large substituents at the N-terminus" caused a 90% loss in proteasome binding and new cell permeability issues. PF ¶ 55.   Moreover, Cipla's arguments cherry-pick from confidential internal Proteolix work that is not prior art (CB 13-14) and simply ignore that Proteolix intentionally sought to modify every location on the molecule (including the warhead) (PF ¶ 101).

### b.      A POSA Would Not Have Chosen a Weakly Basic Amine Substituent

Guided by hindsight, Cipla ignores the chemical universe to focus on amine substituents. PF ¶¶ 57-59. Yet Cipla's only support for that narrow focus, Patrick 2001 (DTX-56), actually describes many other techniques to improve solubility and drug membrane permeability through chemical modifications. These include: adding alkyl, acyl, or N-alkyl substituents; varying polar functional groups and aromatic substituents; and making prodrugs. PF ¶ 57. Even then, none would be a predictable solution to low solubility. PF ¶ 71. As Dr. Bachovchin acknowledged, "[t]here's no such

13

thing" as a formula to obtain the right balance for solubility and deliverability—"[i]t's more of an art actually to get the right balance of properties." *Id.*

Even if a POSA chose to add a weakly basic amine to the N-terminus of YU-101, there were thousands of such substituents. PF ¶ 60. Cipla offers no reason other than hindsight to pluck a morpholino from this sea of options. *Id.*; *Mylan v. Research Corp.*, 914 F.3d at 1376 (rejecting obviousness based on general strategy for modifying chemical compounds without evidentiary link to point out specific substituent); *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 531-34 (S.D.N.Y. 2007), *aff'd*, 536 F.3d 1361 (Fed. Cir. 2008) (invention not obvious where there were "thousands and thousands of permutations and paths facing a person of ordinary skill") (internal quotations omitted); *Ortho-McNeil.*, 520 F.3d at 1364 (not obvious when art provided no "reason to select (among several unpredictable alternatives) the exact route" to the invention).[5]

### c.    A POSA Would Not Have Added a Basic (Chargeable) Morpholino to the N-Terminus of YU-101

The prior art taught away from adding a basic chargeable group (an amine) to the N-terminus because it would decrease potency and CT-L subunit selectivity—the two goals that Cipla claims would have motivated the choice of YU-101 as a lead. PF ¶¶ 61, 69. For potency, the prior art taught across multiple classes and varying lengths of proteasome inhibitors that the N-terminus must be neutral and not able to be charged (more "hydrophobic"). PF ¶¶ 61-65. For example, a more hydrophobic N-terminus resulted in a 10-fold increase in potency in the 2-aminobenzylstatine class; a 16-fold increase in potency in the aldehydes; and a 26-fold increase in potency in the boronates. PF ¶¶ 61-63. Consistent with this teaching away, Elofsson 1999 taught that a compound with a basic, chargeable amine at the N-terminus (less hydrophobic) had 30-fold less activity *and* less CT-L

---

[5] In *Merck v. Biocraft,* a pre-*KSR* case cited by Cipla, the prior art "expressly" taught that all 1200 options would produce a formulation with the claimed properties. 874 F.2d 804, 806-07 (Fed. Cir. 1989). Even under Cipla's interpretation, it was entirely unknown whether solubility would be increased by using any of the many options: "there is no formula." PF ¶ 71.

subunit selectivity than the comparable compound with a neutral hydrophobic N-terminus (*i.e.*, YU-101). PF ¶ 64. Dr. Bachovchin conceded this fact. *Id.* Dr. Bachovchin also agreed that Bogyo 2002 acknowledged the teaching away in Elofsson 1999. PF ¶ 54.[6] These trends taught away from adding a basic chargeable amine to YU-101's N-terminus. PF ¶ 61-65. "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 550 U.S. at 417; *Daiichi Sankyo*, 619 F.3d at 1351, 1355 (single oxygen atom modification not obvious when prior art taught away from a hydrophilic group at that position); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 995 (Fed. Cir. 2009) (moving single substituent one carbon away is not obvious where "the nitrogen atom is in a different position" and "differ[s] in three dimensional shape, charge distribution and hydrogen bonding properties").

Cipla contends a POSA would have selected YU-101 for its CT-L subunit selectivity and potency, then added a basic chargeable amine that the art taught would decrease both characteristics. That is contrary to common sense and the law. PF ¶ 69; *Daiichi*, 619 F.3d at 1356 (POSA would not select "compounds as leads only to disregard one of their distinguishing characteristics"); *Mylan v. Research Corp.*, 914 F.3d at 1376 (lack of motivation to modify where "reductions in potency and the significant conformational changes . . . would have been expected").

### 3. Designing a Better Molecular Probe Would Not Have Led to Carfilzomib

Cipla belatedly proposes an alternative to its flawed trial argument: creation of an improved molecular probe. CB 4-6. None of Cipla's experts offered testimony to support this.[7] Dr. Bachovchin

---

[6] Cipla does not address the evidence of teaching away in its brief, and its proposed findings of facts are rebutted in PF ¶¶ 66-68.

[7] Cipla relies on the inclusion of three disputed facts in the pre-trial order as notice of its "probe" theory. CB 5-6; Closing Tr. 1475:12-1476:17. But those paragraphs appeared under the sub-heading,

did not testify about the need for new molecular probes for the ***proteasome***; he testified in connection with his own work on DASH protease inhibitors that general uses of ***protease*** inhibitors could include probes. *See* CB 6; PF ¶ 23. No expert testified about any motivation to modify YU-101 to make a molecular probe. The only purported motivation for modifying YU-101 that Cipla offers is improving YU-101's solubility as an injectable therapeutic. That motivation is inapplicable to probes. PF ¶ 74. The point of a molecular probe would be to target a proteasome subunit. PF ¶ 75. Choosing YU-101 because it is selective for the CT-L subunit, only to add a methylene morpholino at the N-terminus—which the art taught would ***decrease*** CT-L subunit selectivity—makes no sense. *Id.*; *Daiichi*, 619 F.3d at 1356. Moreover, Cipla conceded that as a probe, YU-101 was already optimized. CB 8; PF ¶¶ 74.

### 4.   Cipla Did Not Prove That a POSA Would Have Had a Reasonable Expectation of Success

Cipla ignores entirely the requisite reasonable expectation prong of the obviousness analysis. Under any of Cipla's theories, the path to carfilzomib was not one of "a finite number of identified, predictable solutions" that led to "the anticipated success" that *KSR* deems obvious. 550 U.S. at 421; PF ¶¶ 54, 71. The evidence that carfilzomib's beneficial properties (including solubility, potency, and lack of toxicity) could not have been predicted is unrebutted. PF ¶¶ 70-73. In fact, the art taught away from Cipla's proposed modifications because a POSA would have known that those modifications would decrease the properties that Cipla claims are needed for either a drug or probe. PF ¶ 73.

### C.   Cipla's Resurrected §112 Defense Should Be Rejected

Cipla offers no authority for its rule that a patent specification must "add information" that compares the inventions to "what has already been disclosed in the prior art." CB 19-21. No such

---

"A POSA Would Have Been Motivated to Investigate Peptide α,β Epoxykeytone Proteasome Inhibitors *As A Therapeutic Agent for Cancer*." D.I. 476, Ex. 3 at 61.

16

requirement exists. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1308 (Fed. Cir. 2011) ("evidence supporting nonobviousness need not be contained within the specification").

Cipla admits that these invalidity arguments invoke the "enablement" requirements of §112. CB 20. But, Cipla explicitly withdrew its enablement defense before trial. Ex. 1 ("Defendants will not be pursuing . . . [that] [t]he asserted claims of the '042 and '112 patents are not enabled"); D.I. 490 at 59:15-19. To escape that choice, Cipla now argues that enablement is part of obviousness. That is not the law. *Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1310 (2015).

Regardless, Cipla's enablement argument fails on the merits. Therapeutic utility can be enabled by a showing of a method of manufacture and pharmacologic activity. PF ¶ 76; *See In re Brana*, 51 F.3d 1560, 1567 (Fed. Cir. 1995) (experimental data of pharmacological activity sufficient to support asserted therapeutic utility, no clinical data required). Contrary to Cipla's assertions, the Compound Patents disclose data from tests and experiments on proteasome inhibitory activity showing the claimed compounds' utility that is not in the prior art. PF ¶ 76.

## V.    Cipla Did Not Prove That the Compound Patent Claims Are Invalid Under 35 U.S.C. §102(f)

To prove its derivation defense, Cipla must show by clear and convincing evidence: (1) prior conception of carfilzomib by another; and (2) communication of that conception to the named inventors. *Cumberland Pharm. v. Mylan Institutional LLC*, 846 F.3d 1213, 1217-18 (Fed. Cir. 2017). Cipla references two different draft proposals (DTX-993, DTX-992B); a call among Drs. Bunin, Crews, and Molineaux; and the final "Research Plan" (DTX-167). CB 22-23, 25. None of these confidential communications disclose carfilzomib. PF ¶¶ 78-85, 87 n.6. And, Cipla offers no clear and convincing evidence that any of these documents, including the final Research Plan, was communicated to the named inventors before they invented carfilzomib. PF ¶ 87.

17

## A.     The Research Plan Does Not Show Conception of Carfilzomib

The law is clear that "conception requires more than 'a general goal or research plan.'"

*Cumberland Pharm.,* 846 F.3d at 1218. "Conception is the formation in the mind of the inventor of a

definite and permanent idea of the complete and operative invention, as it is therefore to be applied

in practice." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003). Conception must encompass ***all***

limitations of the claimed invention. *Id.*; *see also Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40

F.3d 1223, 1229 (Fed. Cir. 1994) (compound is conceived when one knows of its specific chemical

structure, has a method for making it, and appreciates its utility).

The Research Plan does not do this. It is an unpublished, confidential memorandum compiled

by Proteolix consultants, officers, and directors proposing various approaches for developing new

proteasome inhibitors. PF ¶ 77. It does not disclose the structure of carfilzomib, or how to make it.

PF ¶ 78-85. Instead, it proposes thousands of possible ways to modify epoxomicin and YU-101 at

numerous different positions, including prodrug and warhead modifications, as well as ways to

search for other starting points. PF ¶¶ 77, 101. This general plan, without any disclosure of

carfilzomib, does not establish conception. *See Cumberland Pharm.*, 846 F.3d at 1218.

## B.     "R=Morpholino" Does Not Disclose Carfilzomib

To argue prior conception of carfilzomib, Cipla highlights a single sentence from the

Research Plan. That sentence recites the addition of a chemical substituent to the N-terminus of YU-

101, where the "R" group to be added is a morpholino:

N-Terminus Analogs

R = morpholino, 2-pyrazinecarbonyl (from Veleade) and other solubiliting groups like alkyl tertiary amines, etc.   Substitution of amino acids in the tetrapeptide can include many approaches.  One is non-natural amino acids that are outside current patent claims: i.e., N-methyl amino acids such as sarcosine at P4.  Alternatives to the P1-P4 residues need to be outside the Chemistry & Biology Crews paper, the revised claims of the Crews patent, the Konishi epoximicin patents, and the published claims of the Mundy patent.

PF ¶ 78. ***That disclosure is not carfilzomib***, as was acknowledged by Dr. Bachovchin. PF ¶¶ 79-82.

Carfilzomib on its N-terminus has a morpholino group attached by a methylene linker—a "morpholino methylene", which can be positively charged. PF ¶¶ 80-81. In contrast, the Research Plan discloses a morpholino with a urea linkage—a "morpholine carbonyl," which is neutral and cannot be charged. *Id.* As Dr. Lipinski explained, the type of linkage used affects the properties of the morpholino (and the molecule as a whole). PF ¶ 80; PDX-6.52. The figure below (PDX-6.52) illustrates differences between carfilzomib (on the ***right***) and the "R=morpholino" molecule of the Research Plan (on the ***left***):



Dr. Bachovchin acknowledged that the "R=morpholino" disclosure in the Research Plan "discloses attaching the morpholino with [a] urea linkage," which makes a "morpholine carbonyl." PF ¶ 82. The structure that Dr. Bachovchin identified during his cross-examination (below) matches exactly

what appears in the Research Plan (PDX-6.52, above left), and is not carfilzomib:



PF ¶ 82. Dr. Bachovchin also acknowledged that: (1) the morpholino carbonyl with a urea linkage, as disclosed in the Research Plan, is different from the morpholino methylene found in carfilzomib; and (2) the methylene changes the resulting molecule's properties. PF ¶¶ 81-82.

Nevertheless, Cipla argues that a POSA would not have read the Research Plan to teach a morpholino attached by urea linkage—***even though, as Dr. Bachovchin agreed, that is what the Research Plan literally discloses.*** CB 23. According to Cipla, a POSA would have understood the Research Plan diagram only as a "general concept of adding a solubilizing group to the N-terminus without showing how each would be joined," instead of a "literal structure," and would ***assume*** the existence of a methylene linker instead of what was literally written (the urea linkage). CB 23. Cipla reasons that a urea linkage would not be charged and would not improve the water solubility.

The record does not support Cipla's interpretation. According to the Research Plan itself, the "R=" groups in the Research Plan need not be charged. The Research Plan includes "2-pyrazinecarbonyl (from Velcade)" as a possible R group. PF ¶ 84. This group, as Dr. Bachovchin admitted, cannot be charged, but the nitrogen heteroatoms on it can "make the molecule a little bit more soluble." *Id.* Bortezomib uses that 2-pyrazinecarbonyl on its N-terminus and is soluble enough to be delivered. PF ¶ 162. Moreover, as Dr. Bachovchin acknowledged, a morpholino carbonyl with a urea linkage (as disclosed in the Research Plan) contains the ***same*** heteroatoms (O and N) that may increase solubility, so a POSA would not, as Cipla argues, disregard the literal disclosure of "R=morpholino." *Id.* In fact, there is no evidence in the prior art of any proteasome inhibitor

compound with a morpholine methylene at the N-terminus; the prior art Velcade® patent (Adams'454) discloses the same morpholino carbonyl with a urea linkage literally disclosed in the Research Plan. PF ¶ 83.

The Research Plan thus discloses a *specific structure* using chemical nomenclature, not a "general concept." PF ¶¶ 79, 85. Even if Cipla's interpretation of the Research Plan were correct, however, a "general concept" is not conception. *Singh*, 317 F.3d at 1341 (articulating a goal without also articulating a clearly defined solution precludes conception); *Bosies v. Benedict*, 27 F.3d 539, 542 (Fed. Cir. 1994) (no conception based on a chemical structure that did not clearly identify the number of linking carbons); *Huang v. Cal. Inst. of Tech.*, No. 03-1140, 2004 WL 2296330, at *6-8 (C.D. Cal. Feb. 18, 2004) (general disclosure of using multiple colors to tag DNA does not support conception of a specific claimed solution).

### C.    Drs. Crews and Bunin Are Not Inventors of Carfilzomib

Cipla does not identify the unnamed inventor(s) from whom the carfilzomib invention was allegedly derived. If Cipla is arguing that at least Drs. Crews and Bunin conceived of carfilzomib, Cipla produced no evidence to substantiate that claim. Dr. Crews testified that he did not invent carfilzomib. PF ¶ 86. Cipla never asked Dr. Bunin if he was an inventor of carfilzomib. *Id.* Dr. Molineaux testified that neither Dr. Crews nor Dr. Bunin ever said that they should be named as an inventor of carfilzomib or believed that they invented carfilzomib. *Id.* Courts have declined to find incorrect inventorship where an allegedly omitted individual did not assert "any claim to inventorship." *Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, 35 F. Supp. 3d 163, 172 (D. Mass. 2014).[8]

---

[8] Conception requires that the inventor recognized and appreciated a compound corresponding to the compound defined by the claims. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005); *see also Teva Pharm. Indus. Ltd. v. AstraZeneca Pharm. LP,* 748 F. Supp. 2d 453, 466 (E.D. Pa. 2010), *aff'd*, 661 F.3d 1378 (Fed. Cir. 2011). There is no evidence that Dr. Bunin

### D. Cipla Did Not Prove Communication of a Prior Conception of Carfilzomib to the Named Inventors

Because the Research Plan does not disclose carfilzomib, any alleged communication thereof is insufficient to support a claim of derivation. "[D]erivation is not proved by showing conception and communication of an idea different from the claimed invention." *Cumberland Pharm.*, 846 F.3d at 1219. Beyond that, Cipla has not proved that the Research Plan was communicated to Dr. Smyth, and Cipla has never alleged communication to Dr. Laidig. Although Dr. Smyth testified that it was "possible" he received a copy of the final Research Plan (DTX-167), clear and convincing evidence requires more than a mere possibility. PF ¶ 87; *see Proctor & Gamble*, 566 F.3d at 994. Cipla's reference to different drafts of the Research Plan dated prior to Drs. Laidig and Smyth's invention of carfilzomib, and the alleged "speed" with which Drs. Laidig and Smyth invented carfilzomib, do not evidence the requisite communication of the Research Plan or meet the requisite standard of proof. CB 25. Accordingly, there can be no derivation. *See Cumberland*, 846 F.3d at 1218.[9]

There was also no "simultaneous" invention in this case. CB 26; PF ¶ 98. Both Drs. Laidig and Smyth testified that they first thought about the structure of carfilzomib when they worked together during a brainstorming session, and the corroborating evidence shows their hand-drawn structures on a whiteboard in January 2004. PF ¶ 88. Carfilzomib was first made in June 2004. PF ¶ 7. Even if they had independently conceived of carfilzomib, that would still not support a finding of obviousness. *See Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452, 1460-61 (Fed. Cir. 1984) (finding that "it clearly is not" evidence of obviousness where two individuals who allegedly simultaneously conceived of invention were co-inventors on the patent).

---

made any compounds that he drew, conducted testing, or "evaluated the results and understood them to show the existence [of] the invention." *Invitrogen*, 429 F.3d at 1065.

[9] The inventorship of the Asserted Patents is correct. But if inventorship was incorrect, Onyx could correct it under 35 U.S.C. §256. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998).

## VI.   Cipla Did Not Prove That the Compound Patent Claims Are Obvious Over the Research Plan

As an alternative to its derivation argument, Cipla argues that the Research Plan is available as §102(f) prior art for use in an obviousness challenge. CB 24. Cipla's "alternative obviousness" theory concedes that the compound in the Research Plan is not carfilzomib (as is required to be distinct from derivation). Instead, Cipla's alternative obviousness argument presumes (correctly) that the Research Plan discloses another compound—the morpholino urea. *Id.* Under this theory, however, and as explained below, the Research Plan cannot be used as §103 prior art.

### A.   35 U.S.C. §103(c)(1) Precludes the Use of the Research Plan as Prior Art for an Obviousness Challenge

Cipla bears the burden of proving that the contributions made by Drs. Crews and Bunin to the Research Plan are prior art. *Mahurkar*, 79 F.3d at 1576. The law is clear, however, that any such contributions would be ineligible for use as prior art in an obviousness challenge. The Patent Act excludes §102(f) subject matter as prior art for an obviousness challenge when that ***subject matter*** (the Research Plan) and the ***claimed invention*** (carfilzomib) were commonly owned or subject to an obligation of assignment to the same person.[10] 35 U.S.C. §103(c)(1):

> ***Subject matter*** developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and ***the claimed invention*** were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person.

Crucially, §103(c)(1) distinguishes between the "subject matter developed by another" and "the

---

[10] Contrary to Cipla's suggestion, a joint research agreement naming Dr. Bunin as a party need not have been disclosed during prosecution of the Patents-in-Suit in order to qualify for the exemption under §103(c)(1). Joint research agreements are covered by 35 U.S.C. §103(c)(2)-(3), ***not*** §103(c)(1). The legislative history of §103(c)(2)-(3) also makes clear that it did not change existing law under §103(c)(1) excluding commonly owned or assigned prior art from an obviousness challenge. *See* H.R. REP. NO. 108-425, at 9 (2004) ("The amendments made in this Act ***do not alter existing law*** governing inventions under § 103(c) where the invention and the subject matter at issue are commonly owned or subject to an obligation of common assignment.").

claimed invention." *Id.* According to the statute, the relevant time period for assessing when the subject matter and the claimed invention were commonly owned or subject to an obligation of assignment to the same person is "at the time *the claimed invention* was made." 35 U.S.C. §103(c)(1); *see, e.g.*, *Indus. Tech. Research Inst. v. Pac. Biosciences of Cal., Inc.*, 640 F. App'x 871, 883 (Fed. Cir. 2016). Under Cipla's alternative obviousness theory, the date of a draft Research Plan (September 4, 2003) cannot be the invention date because the compound in the Research Plan is not carfilzomib. Accordingly, September 2003 cannot be the operative date for assessing whether the §103(c)(1) exemption applies. Conception of the claimed invention (*i.e.*, carfilzomib) did not occur until 2004. PF ¶¶ 5-7. By 2004, both Drs. Bunin and Crews were obligated to assign their Research Plan contributions to Proteolix.

### B.    Dr. Bunin Was Obligated to Assign His Contributions to Proteolix

According to Cipla, Dr. Bunin was "under no obligation to assign his inventions to Proteolix until *after September 17, 2003*." CB 27. Whether Dr. Bunin had an obligation to assign his work to Proteolix on or before September 17, 2003 is not determinative. His obligation to assign his work to Proteolix existed by the time the named inventors conceived of the compound—*i.e.*, no earlier than January 2004. And Cipla concedes that Dr. Bunin had assigned months earlier, by September 18, 2003.[11] CB 27; PF ¶¶ 95-97.

At any rate, Cipla's conclusions about the effective date of DTX-451 are wrong. DTX-451 is a consulting agreement that recites that Dr. Bunin "hereby assign[ed]" his rights to Proteolix effective as of August 30, 2003 for any invention that he developed as a Proteolix consultant. PF ¶¶ 96-97; DTX-451 at 2. The contractual language "hereby assigns" creates an automatic assignment as a matter of law. *DDB Techs. v. MLB Advanced Media*, 517 F.3d 1284, 1290 (Fed. Cir. 2008);

---

[11] This is also before the date of the final Research Plan (September 20, 2003), the only "subject matter" that Cipla contends had been communicated and could be §102(f) prior art. PF ¶ 87 n.6.

*Agrofresh Inc. v. Mirtech, Inc.*, 257 F. Supp. 3d 643, 656-57 (D. Del. 2017). The law permits such assignment to be retroactive. *Du Frene v. Kaiser Steel Corp.*, 231 Cal. App. 2d 452, 458 (D. Ct. App. 1964) ("[A] party of a contract may retroactively adopt prior acts or fix retroactive dates of execution for a contract."); *see also Sweetman v. Strescon Indus.*, 389 A.2d 1319, 1322 (Del. Super. Ct. 1978) ("When a party executes a contract which is effective on a prior date[,] the party establishes its contractual obligations as of the prior date [and] it accepts the events which have occurred since that prior date."). DTX-451 also includes an "entire agreement" clause indicating that it supersedes all prior agreements between the parties, which includes DTX-890. PF ¶¶ 96-97; DTX-451 at 3. DTX-451 thus confirms, rather than refutes, that Dr. Bunin assigned his Research Plan contributions to Proteolix effective August 30, 2003.

### C. Dr. Crews Was Obligated to Assign His Contributions to Proteolix

Dr. Bunin, not Dr. Crews, contributed to the "R=morpholino" disclosure in the Research Plan. PF ¶¶ 91-93; *see also* PF ¶¶ 89-90. Dr. Crews testified that he contributed only ideas concerning YU-101 warhead modifications. PF ¶ 93. Every fact witness agreed that Dr. Crews did not contribute to "R=morpholino." PF ¶ 93. Cipla offered no evidence to the contrary. PF ¶ 94.

Dr. Crews had an obligation to assign any rights he had in the Research Plan to Proteolix before 2004. PF ¶ 99. As a director of Proteolix from October 2002 through November 2003, Dr. Crews owed a fiduciary duty, including a duty of loyalty, to assign any inventions he made to the Company. *Id.*; *see McGovern v. Gen. Holding, Inc.*, No. 1296-N, 2006 WL 4782341, at *17 n.78 (Del. Ch. June 2, 2006) ("an officer or director of a corporation generally has a fiduciary duty to assign patents to that corporation") (internal citation omitted). And Cipla concedes that Dr. Crews had an obligation to assign inventions to Proteolix at least as of November 2003, when he ended his tenure as director and signed a consulting agreement with the Company. CB 28.

Dr. Crews never used Yale laboratories or resources for work related to the Research Plan,

25

and he advised Yale of his work with Proteolix through conflict of interest forms that identified his fiduciary duty to Proteolix. PF ¶ 99 n.8. Dr. Crews acted on this responsibility with respect to inventions made as part of his work with Proteolix. As Dr. Bachovchin conceded, both Drs. Crews and Bunin assigned their respective rights as inventors of the '818 Patent—which includes the urea-linked morpholino carbonyl compound in the Research Plan—to Proteolix. PF ¶ 100.

### D.     The Research Plan Would Not Render Carfilzomib Obvious

Even if the Research Plan were available as prior art for obviousness, Cipla failed to prove by clear and convincing evidence that the Research Plan renders the asserted claims of the compound patents obvious. To the contrary, the Research Plan demonstrates non-obviousness. ***First,*** the plain text of the Research Plan discloses myriad potential compounds that were not carfilzomib and could not have led to it. PF ¶ 101. Dr. Bachovchin conceded that the Research Plan discloses "way more than" thousands of potential compounds. PF ¶ 101. ***Second,*** Cipla incorrectly states that Proteolix chose YU-101 as a lead compound before the inventors were hired. CB 10. However—as Dr. Bachovchin also conceded—the Research Plan says to continue to search for other lead compounds. DTX-991 at 2, 10; PF ¶ 101. ***Third,*** as Dr. Bachovchin confirmed, the Research Plan disclosed plans to modify YU-101 at all locations on the compound, along the backbone and the warhead. DTX-991 at 8-9; PF ¶ 101. ***Fourth,*** as Dr. Bachovchin admitted, the Research Plan focused on potentially changing the warhead to a reversible warhead. DTX-991 at 2, 9; PF ¶ 101. ***Fifth,*** the Research Plan endorses prodrugs and modifications to the warhead as most likely to succeed instead of the "R=" modification strategies. DTX-991 at 11; PF ¶ 101.

***Finally,*** Cipla failed to prove that a POSA would have been motivated to select the urea-linked morpholino carbonyl compound out of the Research Plan from all of the prior art—including more promising leads—to then modify. *See supra* Section IV.A. The Research Plan lacks any data that a POSA could have used to select the urea-linked morpholino carbonyl compound even from

among the compounds disclosed therein. And, the Research Plan itself taught that other compounds were more promising candidates. PF ¶ 101. Cipla skips the predicate question of *why* a POSA would have selected the "R=morpholino" structure for modification, and jumps instead into modifying the urea-linked morpholino carbonyl into a morpholino methylene. CB 24. Even then, a POSA would not have been motivated to make that change. PF ¶ 102. Dr. Bachovchin admitted that the prior art on which Cipla relies discloses only morpholino carbonyls, which have the opposite properties of the morpholino methylene found on the N-terminus of carfilzomib. PF ¶ 102.[12]

## VII.   Cipla Did Not Prove That the Compound Patent Claims Are Invalid for Obviousness-Type Double Patenting Over Claim 15 of the '099 Patent

Cipla argues that the '099 Patent—assigned to Yale and licensed to Onyx—can be used as an obviousness-type double patenting reference against the Compound Patents, which are assigned to Onyx and lack common inventors with the '099 Patent.[13] PF ¶ 103. But, obviousness-type double patenting can apply only when patents *commonly owned* by the same entity, or sharing common inventors, claim patentably indistinct subject matter. *Novartis Pharm. Corp. v. Noven Pharm., Inc.*, 125 F. Supp. 3d 474, 487 (D. Del. 2015). Absent common inventors, obviousness-type double patenting requires proof that the claimed inventions were wholly owned by the same entity at the time the second invention was made. *See id.* There is no such proof here.

Instead, Cipla draws on the "all substantial rights" test from the law of standing[14] to argue

---

[12] Cipla argues that it would have been obvious to attach the morpholine via the nitrogen to make it protonated and that Dr. Lipinski "conceded" that. CB 24. Dr. Lipinski made no such "concession." Of the many ways to attach the morpholine to YU-101, both the urea-linked morpholino carbonyl and morpholino methylene attached through the nitrogen, and only one is protonated. PF ¶ 85.

[13] On its face, the license agreement is between Yale and Onyx's predecessor-in-interest to the Patents-in-Suit, Proteolix. DTX-195 at 1.

[14] The only case Cipla cites involves issues related to standing, which asks when a patent owner must join an infringement suit brought by an exclusive licensee. CB 29 (citing *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1342 (Fed. Cir. 2014), *vacated*, 135 S. Ct. 1846 (Apr. 20, 2015) (No. 14-976) (addressing the question of standing)).

that, as an exclusive licensee of the '099 Patent, Onyx should be treated as an "effective owner." CB 28-30. No court has applied the obviousness-type double patenting doctrine under such circumstances, and all courts that have considered the issue have declined to do so. *See, e.g.*, *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, No. 95-3577, 1996 WL 467293, at \*9 (N.D. Cal. July 24, 1996) (declining to "broaden[] the concept of double patenting to include 'effective' common ownership").

Regardless, even under that standard, Yale retained rights to the '099 Patent that the Federal Circuit has recognized are "substantial," thus precluding a finding that a licensor had transferred "all substantial rights." PF ¶ 104; DTX-195. For example, Yale retained a right to sue for patent infringement and to terminate the license for a variety of reasons, and the license placed significant restrictions on Onyx's (but not Yale's) ability to transfer its rights under the agreement. PF ¶ 104; *see Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1361 (Fed. Cir. 2010) ("Where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee.").

Even if the law permitted the '099 Patent to be used as an obviousness-type double patenting reference against the asserted claims of the Compound Patents, it would not render those claims invalid. PF ¶ 105. Claim 15 of the '099 Patent claims YU-101, while the asserted claims are directed to carfilzomib. PF ¶ 105. Thus, to prevail on its obviousness-type double patenting defense, Cipla would still have had to demonstrate that a POSA would have been motivated to modify YU-101 to arrive at the structure of carfilzomib. *Otsuka*, 678 F.3d at 1298 (obviousness-type double patenting requires finding that a POSA "had reason or motivation to modify the earlier claimed compound to make the compound of the asserted claim with a reasonable expectation of success"). As explained above, Cipla failed to meet that burden.

## VIII.   Cipla Did Not Prove That the Asserted Claims of the '112 Patent Are Obvious

Proteolix's novel pharmaceutical formulations containing carfilzomib, in an aqueous solution of 10% (w/v) sulfobutylether cyclodextrin ("SBECD") and 10 mM citric acid, adjusted to pH 3.5 (claim 31), and a lyophilizate containing carfilzomib and SBECD (claim 32), were nowhere in the prior art. Nor has Cipla identified any combination of prior art demonstrating that such formulations would have been obvious. ***None*** of the prior art cited by Cipla disclosed carfilzomib or taught one how to formulate it in a pharmaceutical composition.

In developing a new formulation, a POSA must balance many competing and interrelated factors, including stability, solubility, manufacturability, absorption, safety, and patient acceptance. PF ¶ 106. There were no prior art formulations of ***any*** drug using the combination of 10% (w/v) SBECD and 10 mM citric acid, adjusted to pH 3.5. PF ¶ 144. It was this unique combination that allowed Proteolix to formulate carfilzomib in a pharmaceutical composition. To argue otherwise, Cipla relies on hindsight, plucking each individual component of the claimed formulation from the universe of options available to a POSA. Obviousness is not proved, however, "merely by demonstrating that each. . .element[] was, independently, known in the art." *KSR*, 550 U.S. at 418. "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight." *Otsuka*, 678 F.3d at 1280. Cipla fails to identify even one prior art formulation in which a drug containing an epoxyketone (like carfilzomib) was formulated with any cyclodextrin.

Obviousness also requires proof of a motivation to combine the teachings of the prior art to achieve the claimed invention and a reasonable expectation of success in doing so. The proper inquiry is whether the claimed compositions, ***as a whole***, would have been obvious. *Unigene*, 655 F.3d at 1360 ("[O]bviousness requires [that a POSA] would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention."). Cipla fails to identify any specific combination of prior art references; explain why a POSA would

have been motivated to combine the disclosures of those references; or address reasonable expectation of success.

## A.    A POSA Did Not Know the Structure or Properties of Carfilzomib

Both parties' experts agree that a pharmaceutical formulation must be tailored to the structure and properties of the active ingredient. PF ¶¶ 106, 108. As of the invention, however, the structure of carfilzomib (an element of both asserted claims) and its properties were not publicly known. Without this information, a POSA could not have developed the claimed formulations.

Cipla does not contend carfilzomib or its properties were known, but argues that the "carfilzomib limitation is established" because *it would have been obvious* over YU-101.[15] CB 31; DF ¶ 204. As explained above, however, Cipla failed to prove that carfilzomib would have been obvious. *See supra* Section IV. As a result, Cipla cannot prove that the pharmaceutical formulations claimed in the '112 Patent would have been obvious.[16] Even if the structure of carfilzomib had been known, a POSA could not have predicted its properties based on structure alone. PF ¶ 108. Cipla's representative admitted that formulating carfilzomib without knowing its properties would have been "trial and error." PF ¶ 109.

## B.    A POSA Developing a Pharmaceutical Formulation for Carfilzomib Would Have Balanced Solubility and Stability

It was known in the prior art that "[t]wo key aspects of any successful solution formulation are solubility and stability." PF ¶ 145 (Strickley 2004). Assuming the molecule and its properties were known, a POSA would have appreciated carfilzomib's unique stability liabilities and pursued a

---

[15] Because YU-101 was considered during prosecution of the '112 Patent (PF ¶ 144), Cipla's burden of proving that it would have been obvious is heightened. *Minn. Mining*, 976 F.2d at 1572.

[16] Cipla's flawed argument that carfilzomib was obvious as a research probe conflicts with its arguments about the '112 Patent, which is directed to ***pharmaceutical*** formulations. Molecular probes are "not constrained by the concerns that are required for human pharmaceuticals," DF ¶ 75, and a POSA would not have been motivated to create a formulation for a probe.

formulation that balanced these competing factors. PF ¶ 110; PDX-4.17. Cipla, however, focuses almost exclusively on solubility for claim 31, essentially ignoring stability (CB 30-35).

A POSA would have had at least two areas of concern about carfilzomib's stability: (1) its epoxyketone warhead (containing the epoxide ring and a ketone group); and (2) the amide bonds in its peptide backbone. PF ¶ 111. A POSA would have understood that the triangular epoxide ring on the right-hand side of carfilzomib is highly reactive and unstable. PF ¶ 111. This is due to the unequal sharing of electrons in the bonds between the carbon and oxygen atoms in the epoxide ring, as well as the "ring strain" due to the compressed angles of those bonds, making the epoxide extremely susceptible to ring opening. PF ¶¶ 111-112. Carfilzomib's warhead binds to the proteasome by a reaction that opens the epoxide ring, inactivating the proteasome and giving the drug its therapeutic effect. PF ¶¶ 3, 111. If the epoxide ring degrades or opens early, carfilzomib cannot bind to the proteasome and will not work as an efficacious drug. PF ¶ 111.

Similarly, a POSA would have understood that the four amide bonds in the carfilzomib peptide backbone were susceptible to degradation by hydrolysis. PF ¶ 114. The peptide backbone is the core of carfilzomib's "guidance system," which directs the inhibitor to its binding site; a POSA would have understood if the peptide bonds are broken, carfilzomib can no longer function as a drug. PF ¶ 111. As Dr. Rajewski explained, "[i]t is of little value to be able to solubilize a compound in water, if the conditions under which you solubilize it degrade or break open the compound." PF ¶ 110.

The only two references on which Cipla relies do not address the effects of formulation on drug stability. Strickley (DTX-53), which the Examiner considered during prosecution of the '112 Patent, expressly states that "the topic of stability is beyond the scope of this review." DTX-53 at 1; PF ¶ 145. Dr. Amiji admitted that Strickley "doesn't really talk about stability," but rather talks only

about "enhance[ing] solubility." PF ¶ 145. Likewise, the Captisol FAQ (DTX-150) does not address the effects of SBECD on the stability of any drug compounds (only stability of the SBECD itself), and says that many tests would be required to determine whether SBECD would be suitable for a given drug. PF ¶¶ 146-147.

### C. Claim 31 of the '112 Patent Was Not Obvious

#### 1. A POSA Would Not Have Been Motivated to Use SBECD

A POSA tasked with formulating carfilzomib would not have been motivated to select SBECD from among the many available excipients in the art. For example, Strickley includes over fifty different solubilizing excipients used in commercial products in 2004, which could be combined into countless combinations. To address the likelihood that carfilzomib would be unstable in water (due to hydrolysis (PF ¶¶ 111-114)), a POSA would have focused on solubilizing options like co-solvents, emulsions, or suspensions, which would protect carfilzomib from water. PF ¶¶ 136, 145. A POSA would have avoided using SBECD with carfilzomib because the hydroxyl groups on the rims of an SBECD molecule could catalyze the breaking of an epoxide ring, or hydrolyze amide bonds, like those in carfilzomib. PF ¶¶ 126, 129-130. Although Dr. Amiji suggested that SBECD would not "influence" the amide bonds in carfilzomib's backbone or "have an influence" on the epoxide structure due to "steric phenomena," (CB 32-33), he admitted that he did not know where the SBECD hydroxyl groups would be during complexation with carfilzomib (PF ¶ 131). Dr. Amiji's own drawing suggests, however, that they would be adjacent to the peptide backbone. PF ¶ 131. Dr. Amiji also admitted that those hydroxyl groups could facilitate acid-catalyzed opening of an epoxide ring. PF ¶ 131. Dr. Rajewski confirmed that nothing about carfilzomib's three-dimensional structure would hinder SBECD from doing so. PF ¶ 131.

Cipla's assertion that SBECD was a known excipient and was used in the claimed formulation for a known purpose is incorrect. Cipla does not cite a single prior art reference that

discloses a formulation of *any* epoxyketone (much less carfilzomib) with *any* cyclodextrin. PF ¶ 129. Cipla thus has not proven that SBECD had an "established function" for solubilizing carfilzomib or any similar drugs. *KSR*, 550 U.S. at 418. Cyclodextrins were not routinely used at the time, and those of skill in the art considered them to be challenging to use because it was unpredictable whether they would complex with a particular molecule. PF ¶¶ 127-128.

At the time of invention, cyclodextrins were relatively new: the FDA had approved only two drugs (VFEND and GEODON) formulated with SBECD. PF ¶ 134. Neither drug was a peptide, had an epoxide ring, or was indicated for treating cancer. PF ¶ 134. Neither drug was for chronic use; indeed, GEODON's label expressly said that it should not be used chronically, so there were questions about toxicity of SBECD following long-term use as would be needed for myeloma patients. PF ¶¶ 134, 159. The labels for each drug warned that cyclodextrins could be toxic to patients, particularly those with renal failure, which was of concern to multiple myeloma patients, who often have renal failure. PF ¶ 134. Cyclodextrins were also concerning because it was recognized they could sometimes alter a drug's biological properties. PF ¶ 132. What was known about SBECD would thus not have led a POSA to combine it with carfilzomib. PF ¶ 139.

The Captisol FAQ also would not have motivated a POSA to formulate carfilzomib with SBECD. This non-peer-reviewed marketing brochure was merely an invitation to conduct experiments. It contains no "recipes" to formulate any drug, but rather it suggests studying several different concentrations to "get an idea" whether SBECD would work. PF ¶ 146. The brochure explains that the purchaser had to test whether any given concentration of Captisol would complex with and solubilize a particular drug. PF ¶ 146.

### 2.    A POSA Would Not Have Been Motivated to Use pH 3.5

The pH of an aqueous solution significantly impacts stability of a compound. PF ¶ 117. Lower pH corresponds with a higher concentration of hydrogen ions, and hydrogen ions are

important because they catalyze hydrolysis reactions. PF ¶ 115. A POSA making an aqueous formulation of carfilzomib would have preferred neutral pH (~7) because it was known that: (1) peptides are most stable between pH 5 and 7; (2) epoxides are most stable between pH 7 and 11; and (3) the pH of blood (physiological pH) is around 7.4. PF ¶¶ 116-117. At a lower, more acidic pH of 3.5, a POSA would have expected that the acid would degrade carfilzomib by breaking the highly reactive epoxide ring in the warhead or the amide bonds in the peptide backbone. PF ¶¶ 118-120, 125. The susceptibility of the epoxide ring to acid-catalyzed hydrolysis was so well-known that it was disclosed in college textbooks and was an example that "professors love." PF ¶ 118.

A POSA would have been familiar with Long and Pritchard (PTX-265), published in 1956, which teaches that the epoxide ring in isobutylene oxide—the same epoxide ring present in the carfilzomib warhead—degrades at a rate between 1,000 and 10,000 times faster at pH 3.5 than at a neutral pH 7. PF ¶ 120; PDX-4.31. As Dr. Rajewski explained, the presence of the ketone group in the epoxyketone warhead would only *increase* the reactivity of the epoxide. PF ¶ 113. Thus, a POSA would have expected the epoxyketone in carfilzomib's epoxide ring to be unstable at pH 3.5. PF ¶¶ 118-120.

Cipla is silent about Dr. Rajewski's detailed explanation of the potential for water to break carfilzomib's epoxide ring at an acidic pH (in a reaction called a "nucleophilic attack"). PF ¶¶ 111-112, 119. As Dr. Rajewski explained with a 3-D model, nothing about the structure of carfilzomib would prevent this acid-catalyzed degradation of the epoxide ring by nucleophilic attack. PF ¶ 119. In contrast, Dr. Amiji admitted that he did not even consider the possibility of nucleophilic attack on the epoxide ring in forming his opinions. PF ¶ 124.[17]

---

[17] Dr. Amiji cited the Sin reference (DTX-69) for the proposition that carfilzomib would be stable at pH 3.5. But Sin is irrelevant because it uses "neat" TFA, which does not contain any water. Without

Cipla also contends that a POSA would have used a "rule of thumb" to formulate carfilzomib at two pH units below its pKa. CB 34. Dr. Amiji admitted that no prior art supported the existence of his rule of thumb, and Dr. Rajewski had never heard of such a rule. PF ¶ 121. Regardless, a POSA could not have followed Dr. Amiji's purported rule of thumb because the pKa of carfilzomib was not disclosed in the prior art, nor could it be readily calculated. PF ¶ 122. Rather, a POSA would have had to measure the pKa empirically, which would have required complex and extensive testing due to carfilzomib's instability and rate of degradation. PF ¶ 122. In any case, a POSA would not have followed Dr. Amiji's purported "rule of thumb" for carfilzomib because it would have called for using pH 3.0, at which a POSA would have expected carfilzomib to be too unstable to serve as a pharmaceutical composition.

Cipla's claim that a POSA would have used citric acid to maintain pH at 3.5 is based on hindsight. A POSA would have sought to maintain pH near 7, leading to selection of a different buffer. PF ¶ 137. Citric acid was also known to cause degradation. PF ¶ 137.

### 3.    A POSA Would Have Lacked a Reasonable Expectation of Success with the Composition of Claim 31

The fact that a pharmaceutical formulation containing an aqueous solution of carfilzomib could be formulated at a pH of 3.5 was both unexpected and surprising. PF ¶ 140. Cipla fails to address the requirements for obviousness: a POSA's motivation to select and combine teachings in the prior art; and a reasonable expectation of success in doing so. *Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1060-62 (Fed. Cir. 2019) (affirming finding of non-obviousness despite motivation to combine where there was no reasonable expectation of success).

Given the concerns about carfilzomib's stability, a POSA would have had no reason to expect success in combining the elements of claim 31. A POSA would have expected SBECD to

water, TFA does not act as an acid (it has no pH) and thus cannot catalyze epoxide ring opening. PF ¶ 123.

catalyze the breaking of carfilzomib's epoxide ring and peptide backbone, and would not have expected it would instead, surprisingly, complex and increase solubility. PF ¶¶ 139-140. A POSA would also have expected carfilzomib to be too unstable at pH 3.5 for a pharmaceutical formulation. PF ¶¶ 153-154. In other words, a POSA would have expected carfilzomib to degrade in the claimed formulation, rendering it ineffective as a drug. Indeed, Dr. Rajewski was surprised that anyone could even *make* an aqueous carfilzomib formulation. PF ¶ 113.[18]

Cipla's contention that "reality proves Dr. Rajewski wrong" because the formulation of claim 31 works turns obviousness on its head. This hindsight-based argument does not address what a POSA would have expected as of the priority date, which is the only relevant question. The fact that the inventors discovered that a claimed invention actually works cannot render it obvious, or else no useful invention could ever be patented.[19]

## D.     Claim 32 of the '112 Patent Was Not Obvious

For Claim 32, Cipla must prove by clear and convincing evidence that a POSA would have been motivated to formulate carfilzomib with SBECD as a lyophilizate and that they would have had a reasonable expectation of success for a *pharmaceutical composition*. JTX-4 at 34. Cipla cannot do so—no prior art reference disclosed that combination; cyclodextrins were not well understood; and the only two successful formulations using SBECD had active ingredients very different from carfilzomib. *See supra* Section VIII(C)(1). Additionally, a POSA would have found lyophilization to

---

[18] Cipla relies on *Pfizer v. Apotex*, but in that case, a reasonable expectation of success was found because previous use of salts had been successful and selection of the salt was the "only parameter to be varied." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007). Here, there is no such precedent for the use of any of the "numerous parameters" (a solubility enhancer, the pH, a buffer, and the concentrations of all) separately and the combinations result in innumerable possibilities, all unpredictable.

[19] Cipla relies on the title of a presentation listed in Dr. Rajewski's *c.v.* (DTX-274); the presentation itself was not admitted into evidence. It did not concern carfilzomib or even an aqueous formulation. PF ¶ 138. The title, by itself, teaches a POSA nothing about carfilzomib, peptides, epoxides, or the effects of acidic pH or a cyclodextrin.

be undesirable. PF ¶ 142. Cipla also fails to identify why a POSA would have been motivated to combine the elements of claim 32. The only motivation that Cipla offers is that lyophilization was known (a "common technique") and that carfilzomib and SBECD were obvious. CB 35. Cipla's approach of using the invention as a guide to pick and choose elements from the prior art ignores case law, including the need to prove that the entire claimed combination would have been obvious. *KSR*, 550 U.S. at 418; *Unigene Labs.*, 655 F.3d at 1360.

### E.     Neither Claim 31 or 32 of the '112 Patent Is Invalid for Obviousness-Type Double Patenting Over Claim 25 of the '125 Patent

Obviousness-type double patenting requires the Court to identify the differences between the claim of the earlier patent and the claim in the later patent and to determine whether those differences make the claims patentably distinct. After identifying the differences in the claims, the analysis is analogous to a standard obviousness analysis. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1376-77 (Fed. Cir. 2012); *UCB v. Accord Healthcare*, 201 F. Supp. 3d 491, 529 (D. Del. 2016), *aff'd*, 890 F.3d 1313 (Fed. Cir. 2018). The differences cannot be considered "in isolation"—the subject matter must be considered "as a whole." *Id.*

Whereas claim 25 of the '125 Patent (the reference) encompasses the use of ***any*** beta-cyclodextrin, claim 31 of the '112 Patent requires a specific beta-cyclodextrin, SBECD. Cipla focuses almost exclusively on SBECD, ignoring all other differences between the claims. But in contrast to claim 25, claim 31 also requires: (1) SBECD at a specific ***concentration***; (2) a formulation pH "***adjusted to pH of 3.5***"; and (3) the addition of ***10mM citric acid***. PF ¶ 148. The combination of these requirements renders claim 31 patentably distinct from claim 25. Additionally, there would have been no motivation to combine the components of claim 31. This is because a POSA would ***not*** have been motivated to further increase the risk of carfilzomib degradation by changing the formulation to an acidic pH, much less to pH 3.5 as required by claim 31. Because of

these stability concerns, a POSA also would not have had a reasonable expectation of success by using the conditions set out in claim 31. *Bayer Pharma AG v. Watson Labs., Inc.*, 212 F. Supp. 3d 489, 521-22 (D. Del. 2016).[20]

There would also have been no motivation to combine the elements recited in claim 32.  A POSA starting with the formulation of claim 25 would not have had any reason to expect that it would require further modification (PF ¶ 149), and thus would not have been motivated to change that formulation by lyophilizing it. Lyophilization is challenging, and formulators generally avoid it. PF ¶ 156.

## IX.    Cipla Did Not Rebut the Objective Indicia of Non-Obviousness

Federal Circuit precedent mandates that "secondary considerations, when present, must be considered in determining obviousness." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–67 (Fed. Cir. 2000)*; see also UCB*, 201 F. Supp. 3d at 544. These factual inquiries "guard against slipping into use of hindsight." *Graham*, 383 U.S. at 36.

Here, Kyprolis® embodies the features claimed in Asserted Claims and is coextensive with them. PF ¶ 157. "[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016); *Bayer Intellectual Prop. GmbH v. Aurobindo Pharma Ltd.*, No. 15-902, 2018 WL 3410020, at *15 (D. Del. July 13, 2018) (claims to active ingredient are "coextensive" with the approved drug); *Cadence Pharm., Inc. v. Exela Pharma Scis., LLC*, No. 11-733-LPS, 2013 WL 11083853, at *31 (D. Del. Nov. 14, 2013), *aff'd*, 780 F.3d 1364 (Fed. Cir. 2015) (finding nexus

---

[20] Cipla's citation to Dr. Lewis's lab notebook (CB 37) adds nothing—Dr. Lewis used a different cyclodextrin, HPBCD. PF ¶ 152.

because stable drug formulation needed). Therefore, objective indicia of nonobviousness may presumptively be attributed to the patented invention.

A.    **Kyprolis® Fulfilled a Long-Felt But Unmet Need**

In unrebutted expert testimony, Onyx's clinical expert Dr. David Siegel described the needs at the time of the invention for new, improved treatments for multiple myeloma and for improved treatment options for patients with relapsed or refractory multiple myeloma who had failed on other treatments. PF ¶ 158. Kyprolis® met those needs by providing a significant and clinically meaningful increase in the length and quality of patients' lives. PF ¶ 159. PTX-149; PTX-493; PTX-21; PTX-628; PDX-5.8; PDX-5.12. Kyprolis® also provided reduced toxicities, including negligible rates of neuropathy. PF ¶ 160.

The FDA acknowledged the long-felt unmet needs that Kyprolis® fulfilled by granting fast-track designation to Kyprolis® under 21 U.S.C. §356(b). PF ¶ 161; PTX-445. The Federal Circuit has held that this fast-track designation is evidence of unmet need. *See Ferring B.V. v. Watson Labs., Inc.* 764 F.3d 1401, 1407 (Fed. Cir. 2014). An unmet need can be satisfied even where there are prior competing drugs on the market. *Pfizer v. Mylan*, 71 F. Supp. 3d at 475.

B.    **There Was Industry Skepticism That an Irreversible Epoxyketone Inhibitor Like Kyprolis® Would Work as a Therapeutic**

Dr. Molineaux testified at trial about the skepticism that the inventors faced in pursuing an irreversible proteasome inhibitor as a therapeutic option. PF ¶ 162. Onyx's expert Dr. Ross Stein (an inventor of bortezomib) testified that at the time he and his industry colleagues thought Proteolix's founders were "crazy." PF ¶ 162. "If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness. Doubt or disbelief by skilled artisans regarding the likely success of a combination or solution weighs against the notion that one would combine elements in references to achieve the

claimed invention." *WBIP, LLC*, 829 F.3d at 1329. The Proteolix scientists travelled a path no one thought would be successful and in doing so extended the lives of thousands of patients. These are inventions.

## X.    Conclusion

For the foregoing reasons, Onyx respectfully requests that the Court find the patents infringed and not invalid.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
OF COUNSEL:                                    Wilmington, DE  19899
(302) 658-9200
Lisa B. Pensabene                              jblumenfeld@mnat.com
Hassen Sayeed                                  kjacobs@mnat.com
Will Autz                                      mdellinger@mnat.com
Margaret O'Boyle
Caitlin P. Hogan
Carolyn Wall
Eberle Schultz                                 *Attorneys for Plaintiff*
James Yi Li
Samantha M. Indelicato
Mark A. Hayden
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
(212) 326-2000

Meng Xu
O'MELVENY & MYERS LLP
Newport Center Drive, 17th Floor
Newport Beach, CA 92660
(949) 823-6900

John R. Labbé
Kevin M. Flowers
Thomas R. Burns
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL  60606
(312) 474-6300

Wendy A. Whiteford
Brian Kao
C. Nichole Gifford
Joseph E. Lasher
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320-1789
(805) 447-1000

June 14, 2019

# EXHIBIT 1

| From: | Daughtrey, Natasha E |
|---|---|
| To: | O"Boyle, Margaret |
| Cc: | DG-Carfilzomib; CarfilzomibJDG@RLF.com; Jacobs, Karen; Dellinger, Megan E.; Fitzgerald, Alison H; Wall, Carolyn S.; Neglia, Ross; #Kyprolis; *JBlumenfeld@MNAT.com; Pensabene, Lisa B.; MGBKyprolis@marshallip.com |
| Subject: | Onyx v. Cipla et al., C. A. 16-0988-LPS: disclosure |
| Date: | Friday, May 3, 2019 12:02:18 PM |
| Attachments: | image001.png |

Counsel,

Defendants hereby provide the following disclosures:

Defendants will not be pursuing the following defenses at trial:

- The asserted claims of the '042 and '112 patents are not enabled and/or lack written description

Defendants currently intend to move forward with the following defenses at trial:

- The '042, '125, and '112 patents are invalid as obvious

- The '125,'042 patents and '112 patents are invalid for obviousness-type double patenting

- The '042, '125, and '112[1] patents are invalid for improper inventorship

- The '042 and '125 patents are invalid for derivation and anticipated and/or obvious under §102 & 103

- The '042 and '112 patents are unenforceable for inequitable conduct by Susan Molineaux and/or Mark Smyth

- The '125 patent is unenforceable for inequitable conduct by Greg Giotta

- The '125 patent is unenforceable for unclean hands by Onyx Therapeutics, Inc.

Omitted Inventors

- '042 Patent

  i. Barry Bunin

  ii. Craig Crews

- '125 Patent

       i.   Barry Bunin

      ii.   Craig Crews

- '112 Patent

       i.   Barry Bunin

      ii.   Craig Crews

     iii.   Mark Smyth

     iv.   Guy Laidig

Case in Chief Obviousness Prior Art References

| | |
|---|---|
| • DTX 002 | • DTX 133 |
| • DTX 007 | • DTX 134 |
| • DTX 029 | • DTX 140 |
| • DTX 032 | • DTX 143 |
| • DTX 033 | • DTX 150 |
| • DTX 039 | • DTX 179 |
| • DTX 044 | • DTX 180 |
| • DTX 046 | • DTX 209 |
| • DTX 047 | • DTX 230 |
| • DTX 050 | • DTX 242 |
| • DTX 052 | • DTX 250 |
| • DTX 053 | • DTX 256 |
| • DTX 054 | • DTX 274 |
| • DTX 055 | • DTX 285 |
| • DTX 056 | • DTX 322 |
| • DTX 061 | • DTX 341 |
| • DTX 063 | • DTX 364 |
| • DTX 064 | • DTX 367 |
| • DTX 065 | • DTX 369 |
| • DTX 066 | • DTX 401 |
| • DTX 069 | • DTX 402 |
| • DTX 073 | • DTX 403 |
| • DTX 074 | • DTX 413 |
| • DTX 075 | • DTX 430 |
| • DTX 076 | • DTX 431 |
| • DTX 077 | • DTX 432 |

- DTX 081
- DTX 083
- DTX 089
- DTX 090
- DTX 094
- DTX 095
- DTX 098
- DTX 107
- DTX 111
- DTX 112
  - DTX 127

- DTX 433
- DTX 603
- DTX 791
- DTX 952
- DTX 955
- DTX 991
- DTX 993

[1]    We understand Plaintiff to be taking the position that the carfilzomib compound is prior art to the '112 patent.  *See, e.g.,* Plaintiff's Statement of Issues of Contested Fats that Remain to be Litigated at ¶¶ 240-241; Plaintiff's Supplemental Amended Responses to Defendants' Amended Invalidity Contentions at 317-322; D.I. 452, Plaintiff's Opening Brief in Support of Motion for Summary Judgment on Defendants' Unclean Hands Defense, at 10 ("The specification of the '112 patent refers to the compounds used in the claimed formulations as part of the Background of the Invention, not the invention itself.").  To the extent Plaintiff will not stipulate that carfilzomib was prior art to the '112 patent, then Defendants will maintain their defense of improper inventorship of the '112 patent.

**Natasha E. Daughtrey**



Goodwin Procter LLP
601 South Figueroa Street
Los Angeles, CA 90017
o  +1 213 426 2642
f  +1 213 260 8102
NDaughtrey@goodwinlaw.com | goodwinlaw.com

---

[1]    We understand Plaintiff to be taking the position that the carfilzomib compound is prior art to the '112 patent. *See, e.g.,* Plaintiff's Statement of Issues of Contested Fats that Remain to be Litigated at ¶¶ 240-241; Plaintiff's Supplemental Amended Responses to Defendants' Amended Invalidity Contentions at 317-322; D.I. 452, Plaintiff's Opening Brief in Support of Motion for Summary Judgment on Defendants' Unclean Hands Defense, at 10 ("The specification of the '112 patent refers to the compounds used in the claimed formulations as part of the Background of the Invention, not the invention itself.").  To the extent Plaintiff will not stipulate that carfilzomib was prior art to the '112 patent, then Defendants will maintain their defense of improper inventorship of the '112 patent.

*********************************************************************

This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

*************************************************************